## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

CROWNPOINT INSTITUTE OF TECHNOLOGY,
INC., a tribal organization of the Navajo Nation,

      Plaintiff,

v.                                                 Civ. No. 04-531 JP/DJS

GALE NORTON, Secretary of the Interior;
DAVID W. ANDERSON, Assistant Secretary
of the Interior – Indian Affairs in the United
States Department of the Interior; ELOUISE
CHICHARELLO, Director, Navajo Regional
Office, Bureau of Indian Affairs, United States
Department of the Interior; and the UNITED
STATES OF AMERICA,

      Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On May 13, 2004, Plaintiff Crownpoint Institute of Technology, Inc. filed a Verified

Complaint for Injunction and Writ of Mandamus, for Declaratory Judgment and Other Relief

(Doc. 1).  On June 3, 2004 Plaintiff filed a Motion for Injunctive Relief and Writ of Mandamus

(Doc. 2).  The Court denied Plaintiff's Application for Temporary Restraining Order (Doc. 17)

but later entered an Order of Temporary Sequestration of Funds for Fiscal Year 2004, as had been

requested in the TRO (Doc. 25).  Plaintiff filed a Supplemental Complaint on March 15, 2005

(Doc. 67).  Plaintiff seeks declaratory and injunctive relief in the form of mandamus requiring the

Secretary of Interior to award Indian self-determination (P.L. 93-638) contracts , with contract

support costs, for Fiscal Years 2003, 2004 and 2005 for its adult vocational and academic

programs operated in Crownpoint, New Mexico, on the Navajo Nation.

The Court held hearings on Plaintiff's Motion for Injunctive Relief and Writ of Mandamus and a trial on the merits on October 15, 2004, November 17 and 18, 2004, and April 18, 19 and 20, 2005.  In accordance with Fed. R. Civ. P. 52(a) and based on the evidence, the Court makes the following findings of fact and conclusions of law.

## I.      FINDINGS OF FACT

### A.      Parties, Institutional History and Jurisdiction

1.   Plaintiff Crownpoint Institute of Technology ("CIT") provides post-secondary education programs, including adult vocational training and college academic programs, primarily to Navajo Indians.  CIT is located in Crownpoint, Navajo Nation, New Mexico.

2.   The Navajo Nation chartered CIT in 1982, when the school was known as the Navajo Skills Center.  CIT is incorporated as a non-profit organization and is wholly owned and controlled by the Navajo Nation, a federally recognized Indian tribe.

3.   In approximately 1994, CIT sought to manage adult vocational training, which had been run by the Bureau of Indian Affairs ("BIA").  Tr. at 14.  CIT desired to operate the adult vocational training program so that Navajo people could make decisions about the educational opportunities available to tribal members, such as switching from the BIA's avocational pottery and jewelry making programs to job-oriented training programs.  Tr. at 11-12.

4.   James Tutt serves as President of CIT.  Georgianna Tiger works as a lobbyist and assists CIT in obtaining funding through BIA and monies directly from Congress. Tr. at 9.

5.   Defendant Gale A. Norton is the Secretary of the Interior and has responsibility for compliance with the Indian Self-Determination and Educational Assistance Act

2

("ISDA"), P.L. 93-638, codified at 25 U.S.C. § 450, *et seq.*  Defendant David W.

Anderson is the Assistant Secretary of the Interior for Indian Affairs.  Defendant Elouise

Chicharello is the Regional Director of the Navajo Regional Office of the Bureau of

Indian Affairs of the Department of the Interior.  All Defendants are sued in their official

capacities.

6.      CIT brought suit under the ISDA, 25 U.S.C. § 450m-1(a).

**B.      Congressional Appropriations for CIT**

7.      After 1995, Congress appropriated money for BIA to deliver to CIT.  Tr. at 17.  As a result

of lobbying efforts, CIT's congressional funding increased.  The House Conference

Report No. 107-234 at 37-38 (2001) regarding Department of Interior appropriations

specifically listed CIT as a recipient of funds in the Special Programs/Pooled Overhead

category for Fiscal Year ("FY") 2002.  The House Report 108-195 (2003) funds CIT in the

Special Programs and Pooled Overhead category for FY 2004.

8.      The United States House of Representatives Conference Report for Fiscal Year 2003,

H.R. Conf.  Rep.  No. 108-10 at 999 (2003) stated, "[t]he managers do not understand the

disparate treatment of Crownpoint Institute of Technology and the United Sioux Tribes

Technical College related to contract support.  Unless there is an objection by the Navajo

Nation to Crownpoint being treated as a tribal organization, the managers expect the

Bureau to provide this funding under a P.L. 93-638 contract and include contract

support."  The Senate repeated this language for FY 2004 in S. Rep.  No. 108-89 at 41

(2003).

9.      CIT has been successful in increasing its funding.  In FY 2000, Congress earmarked

approximately $249,000 for CIT in BIA's budget, and BIA honored this Congressional

request by giving CIT that same amount in the form of a BIA grant.  The money did not pass through the Navajo Nation.  In FY 2001, the amount increased to over $897,000.  In FY 2002, Congress appropriated approximately $1,200,000 for BIA to deliver to CIT.  In FY 2003, Congress appropriated approximately $1,192,000 for CIT.  In FY 2004, Congress appropriated approximately $1,308,000 in funds that would again go through BIA to CIT in the form of a grant.  Pl. Ex. 74 (revised); Tr. at 188-190.  In FY 2005, Congress appropriated approximately $1,725,000.  In each of these years, BIA funded CIT via a grant in nearly the same amount set aside by Congress for CIT.

**C.      Chronologies of CIT's Contract Proposals and Requests for Technical Assistance**

      **(1)      Fiscal Years 2003 and 2004**

10.      On May 6, 2003 CIT President Tutt wrote a letter to BIA Regional Contracting Officer Jeff Sena regarding CIT's desire to obtain contract support costs for FY 2003 as provided in H.R. Rep.  No. 108-10 (2003).  President Tutt attached the congressional documents for support.  Mr. Tutt never received a direct answer.  Pl. Ex. 8, Tr. at 243.

11.      On July 18, 2003, more than two months later, Regional Director Chicharello sent a letter to President Tutt and attached a memo from attorney Dori Richards explaining that no statutory authority existed to award the money.  Regional Director Chicharello directed President Tutt to contact Self-Determination Officer Rodney Cawston.  Tr. at 249; Pl. Ex. 9.  President Tutt did not have any subsequent communication with Regional Self-Determination Officer Cawston.  Tr. at 251.

12.      On August 18, 2003, Regional Director Chicharello rescinded the July 18, 2003 letter, saying that no statutory authority existed to provide an ISDA grant or contract and noted

that the Regional Contracting Officer (Jeff Sena), not the Regional Self-Determination

Officer (Rodney Cawston), would continue to administer the financial assistance

agreements. Tr. at 250; Pl. Ex. 10. President Tutt described the sequence as, "very

confusing. They are not willing to help us. I think basically, it put [up] a roadblock using

all various excuses to help us receive what we request[ed] under a 638 contract." Tr. at

251. The Self-Determination Contract branch, once headed by Rodney Cawston, is

separate from the Commercial Contracting branch headed by Jeff Sena.

13.     On August 25, 2003, BIA Regional Contracting Officer Sena wrote a letter to CIT

President Tutt stating, "[i]f CIT and the Navajo Regional Office do not sign a grant

agreement no later than September 9, 2003, funding will be lost and we must withdraw

the offer of a financial assistance award." Pl. Ex. 11. Deputy Assistant Secretary for

Management for BIA and the Department of Interior, James McDivitt, told CIT not to

sign a grant, because then CIT would not be eligible for a contract. Tr. at 100.

14.     On September 30, 2003, FY 2003 ended. Prior to the end of FY 2003, President Tutt and

CIT Comptroller Tommy Begay contacted BIA numerous times to inquire as to what was

required for a contract proposal, but they were ultimately unsuccessful in obtaining an

answer from BIA. CIT had not prepared a contract proposal for FY 2003 prior to the end

of the FY 2003 because, according to Ms. Tiger, "[w]e did not know how to do it. We

did not know the requirements. We did not know that this was going to be administered

as a typical tribal 638 contract. We always believed it would be administered as an

educational institution's contract, and that there would be some different kind of

procedure, and we sincerely believed that as we had all these meetings and requests to the

BIA, that they would give us the genuine technical assistance that we needed to put it

together." Tr. at 108.

15.     On October 2, 2003, President Tutt submitted a grant application for federal assistance for

        FY 2004.  Pl. Ex. 12.  On November 5, 2003, Regional Director Chicharello sent President

        Tutt a deficiency letter, informing him what CIT still needed to submit in support of the

        application for a financial assistance grant.  Pl. Ex. 15.  This was the first time CIT had

        received such a letter in its multi-year history of receiving grants from BIA.  Tr. at 254-

        255.

16.     On December 4, 2003 President Tutt formally requested technical assistance via a letter

        sent to Regional Contracting Officer Sena.  Pl. Ex. 16.  President Tutt received no

        response.  Tr. at 261.  CIT never received technical assistance from BIA's regional office.

        Tr. at 261.

17.     On December 9, 2003, CIT submitted to BIA a contract proposal for FY 2003, Pl. Ex. 1,

        and a contract proposal for FY 2004, Pl. Ex. 2.  Regional Director Chicharello hosted a

        meeting at the Gallup BIA offices on that day.  Tr. at 261.  President Tutt, Vice President

        for Academic and Student Services Elmer Guy, and Comptroller Tommy Begay attended

        on behalf of CIT.  Regional Contracting Officer Sena and Regional Director Chicharello

        represented BIA.  Tr. at 263.  At this meeting, President Tutt presented Regional

        Contracting Officer Sena with a letter about BIA's refusal to contract.  Pl. Ex. 69.  The

        letter stated, "CIT has made numerous requests over these three years for assistance from

        your office through which CIT can know and comply with Bureau requirements for

        contracting under P.L. 93-638.  In response to every request made by CIT to your office

        for assistance and cooperation in enabling CIT to contract under P.L. 93-638, the BIA

        response has consistently been to ignore our requests, deny CIT the option of contracting

and force CIT to accept a grant or to receive no funds at all." Pl. Ex. 69. The letter concluded, "if there are any further requirements under P.L. 93-638 that CIT must meet, please provide the necessary technical assistance immediately." Pl. Ex. 69. During the meeting President Tutt gave no indication that CIT was withdrawing the contract proposals for FY 2003 and FY 2004. Tr. at 265.

18.   The December 9, 2003 contract proposal for FY 2003 requested the money that had been appropriated by Congress but not awarded to CIT. CIT wanted these funds in the form of an ISDA contract, plus contract supports costs, and intended to use the funds in FY 2004 since under H.R. Rep. No. 108-10 at 222 (2003) the appropriation authorized a two-year expenditure time frame. The December 9, 2003 contract proposal for 2004 was for a contract, with contract support costs, to be spent in FYs 2004 and 2005.

19.   For FY 2003, CIT concomitantly applied for a $1.2 million grant and a P.L. 93-638 contract for $1.2 million because it knew that the contract application would take a while to process; immediate funds, more likely to be received via a grant, were needed to keep the school running. Tr. at 262-263. For FY 2004, CIT applied for a $1.325 million P.L. 93-638 contract and cited P.L. 108-108 for the fact that Congress had earmarked this amount for CIT on November 10, 2003. Pl. Ex. 1 at 1. For both fiscal years, CIT also requested contract support costs. Pl. Ex. 1.

20.   Regional Director Chicharello testified the December 9, 2003 contract proposals were deficient because CIT had not actually submitted an application, CIT did not submit a proper tribal resolution, and CIT did not meet the statutory requirement of taking over an existing BIA program. Tr. at 264, 799.

7

21.     BIA did not notify CIT of receipt of the December 9, 2003 contract proposals within two

days as required by 25 C.F.R. § 900.15(a).   BIA did not notify CIT of deficiencies in the

contract proposals within 15 days of receipt as required by 25 C.F.R. § 900.15(b).  BIA

did not notify CIT within 90 days that the contract proposals were declined as required by

25 C.F.R. § 900.16.

22.     On January 5, 2004, BIA summoned President Tutt to BIA offices.  Tr. at 265.  President

Tutt signed a grant agreement on that day for $1,187,000 (FY 2003 appropriation), with a

stated performance period of October 1, 2003 to September 30, 2004 (FY 2004

expenditure).  Pl. Ex. 18.  President Tutt signed the grant agreement so that CIT's

operations could continue and he did not give any indication that signing the grant

agreement meant CIT withdrew its December 9, 2003 contract proposals.  Tr. at 266.

23.     On January 13, 2004, Regional Director Chicharello returned the December 9, 2003

contract proposals to CIT with no action because CIT had signed a grant agreement for

FY 2003, which BIA maintains precluded CIT from receiving a contract for the same

services.  Pl. Ex. 19.  Regional Director Chicharello sent President Tutt a letter stating:

"Your letters dated December 9, 2003 to the Regional Director and the Regional

Contracting Officer are returned with no action since you agreed to receive the grant. . . ."

Pl. Ex. 19.  BIA does not assert that CIT has waived the right to apply for the contract.

Instead, BIA asserts that once the money is granted, there is no money left to be

contracted.  Tr. at 42.

24.     On January 22, 2004, Regional Director Chicharello sent President Tutt another letter

stating, "[t]he first step toward a P.L. 93-638 contract is for CIT to submit a contract

proposal pursuant to 25 C.F.R. Part 900." Pl. Ex. 20. The letter cited additional

regulations, and offered technical assistance in this language: "At your request, and

subject to the availability of appropriations, technical assistance is available from Navajo

Region, Self-Determination Office, to assist you in developing your contract proposal."

Pl. Ex. 20. Regional Director Chicharello again directed CIT to contact Rodney Cawston,

even though in a letter dated August 18, 2003 Regional Director Chicharello had

rescinded his name as the correct contact person. Pl. Ex. 20; Tr. at 268. A copy of the

January 22, 2004 letter was sent to ten other individuals or offices. Pl. Ex. 20. Long

before Regional Director Chicharello's January 22, 2004 letter, CIT had requested

technical assistance and nobody from BIA had contacted CIT to provide it. Tr. at 269.

25.    On January 30, 2004, President Tutt resubmitted the contract proposals for FYs 2003 and

2004 with a letter to Regional Director Chicharello. Pl. Ex. 21. He informed BIA of his

contention that BIA had not complied with 25 C.F.R. § 900.22 by returning the December

9, 2003 contract proposals with no action taken. Pl. Ex. 21. He further stated in his letter,

"CIT agreed to sign the grant instrument referenced in your January 13, 2004 letter only

under duress." Pl. Ex. 21.

26.    By a letter dated February 4, 2004, Regional Director Chicharello responded to President

Tutt's January 30, 2004 letter acknowledging receipt of the resubmitted contract proposals

and again directing questions to Rodney Cawston. Pl. Ex. 22.

27.    On February 20, 2004, Acting Regional Director Omar C. Bradley sent CIT a letter

providing it with notice of deficiencies in the contract proposals, as required by 25 C.F.R.

§ 900.15. Pl. Ex. 23. Two deficiencies of chief concern to the pending litigation were a

request for a proper authorizing resolution from the Navajo Nation as required by

25 C.F.R. § 900.8(d), and a request for clarification as to what BIA program CIT proposed

to administer.  Pl. Ex. 23 at 1-2.  The letter closed by saying that no specific request for

technical assistance had been made and such a request must be made in writing.  Pl. Ex.

23 at 3.

28.    By a letter dated March 24, 2004, President Tutt replied to the February 20, 2004 letter

informing BIA that CIT was in consultation with legal counsel; he also sent a copy of this

letter to United States Senator Pete Domenici.  Pl. Ex. 24.

29.    On March 29, 2004 CIT's legal counsel sent a letter to Regional Director Chicharello

responding in detail to the notice of deficiencies.  Pl. Ex. 25.

30.    On May 27, 2004, Regional Director Chicharello wrote to President Tutt to inform him

that since CIT "failed to complete" its contract proposals as requested in the February 20,

2004 letter, BIA "is declining" the contracts under 25 C.F.R. § 900.22(c).  Pl. Ex. 27.  The

letter cited three of the statutory reasons for declination, contained in 25 U.S.C.

§ 450f(a)(2)(C), (D), and (E) and in 25 C.F.R. § 900.22(c), (d), and (e), without any factual

elaboration.  Instead of acknowledging BIA's duty, under 25 U.S.C. § 450f(b)(2) and 25

C.F.R. § 900.30, to provide technical assistance to overcome stated objections whenever a

contract proposal is declined, Regional Director Chicharello merely cited 25 C.F.R.

§ 900.30 as CIT's opportunity to "contact this office" if it wished to "attempt to correct

the deficiencies."  Pl. Ex. 27.  The letter also informed CIT of its right to appeal.

    (2)    **Fiscal Year 2005**

31.     On September 27, 2004, CIT requested to convert its grant to a P.L. 93-638 contract for FY 2005, and submitted a contract proposal in the amount of $1.7 million, plus contract support costs.  Pl. Ex. 89.

32.     On October 12, 2004, BIA's Regional Director sent a deficiency notice to CIT asking what BIA program CIT proposed to administer, and listing nine missing items that BIA said needed to be submitted within 15 days.  Pl. Ex. 82.

33.     CIT submitted a detailed response to BIA on October 28, 2004, along with numerous attachments.  Pl. Ex. 83.

34.     On December 8, 2004, Congress enacted P.L. 108-447, which appropriated $1,725,000 for CIT's adult vocational training programs for FY 2005.

35.     On December 13, 2004, BIA requested a 30-day extension under 25 C.F.R. § 900.17, until January 27, 2005, to review CIT's contract proposal.  CIT agreed to this extension.  Pl. Ex. 88.

36.     On February 25, 2005, BIA declined the FY 2005 contract proposal, citing two of the statutory reasons for declination, contained in 25 U.S.C. § 450f(a)(2)(D) and (E) and in 25 C.F.R. § 900.22(d) and (e), without any factual elaboration.  Pl. Ex. 80.  Again, BIA did not offer technical assistance in compliance with 25 U.S.C. § 450f(b)(2) and 25 C.F.R. § 900.30, but informed CIT that it could attempt to correct the deficiencies by contacting BIA.

37.     Since the litigation began, BIA has not offered to send BIA staff to CIT to provide technical assistance in preparing an ISDA contract proposal.

         **D.     CIT's Contract Proposals Were for Contractible Programs**

38.   In CIT's ISDA contract proposals, CIT proposed to contract programs under the Adult

Indian Vocational Training Act, 25 U.S.C. § 309, a law that permits BIA to enter into

contracts for the training of adult Indians.

39.   BIA had previously cited 25 U.S.C. § 309 as the authority for awarding grant funding to

CIT.  Pl. Ex. 18.

40.   Although BIA stated that CIT was ineligible to contract under the ISDA because there

was no program for which CIT could contract since CIT's program had not been operated

previously by BIA Pl. Exs. 23, 82, BIA had previously operated other educational

programs in New Mexico and elsewhere, just not in Crownpoint.

41.   BIA lists CIT as a "special program" in BIA's annual budget justifications.  Pl. Ex. 96; Pl.

Ex. 97.

42.   BIA had earlier awarded ISDA contracts to other tribal organizations, such as Ramah

Navajo School Board and Alamo Navajo School Board, without requiring the contractors

to take over a program previously operated by BIA. Tr. 469-473, 483, 507, 524.

**E.     Navajo Nation Tribal Resolutions**

43.   BIA cited lack of proper tribal resolutions as a deficiency of CIT's contract proposals

submitted under the ISDA for FYs 2003, 2004 and 2005.  Pl. Ex. 23; Def. Ex. L; Pl. Ex.

82.

44.   There is no bona fide concern regarding CIT's authority from the Navajo Nation to

contract with BIA under the ISDA.

45.   CIT included in its contract proposals for FYs 2003 and 2004 a 1982 document which

stated, "[t]he advisory committee of the Navajo Tribal Council hereby grants an interim

charter to the Navajo Skill Center as a 'tribal organization' for full participation in Public

Law 93-638 programs."  Navajo Nation Resolution ACN-144-82; Tr. at 79; Pl. Ex. 1.  The

Navajo Skill Center became CIT.

46.     The Navajo Nation Code provides that CIT "is further organized for the purposes of

securing funds from public and private sources for support and maintenance of its

educational programs."  Tr. at 93; Pl. Ex. 1.  "In furtherance of these purposes, and

consistent with these articles and all applicable law, the corporation shall have the power

to receive and administer funds."  Tr. at 93; Pl. Ex. 1.

47.     CIT acted with the support of the Navajo Nation when CIT applied for ISDA contracts.

The testimony of Mr. Wallace Charley, Navajo Tribal Council delegate from Shiprock,

New Mexico, Education Committee member, and Higher Education Subcommittee Chair,

supports this finding.  Tr. at 212-213.  At the time of his trial testimony, Mr. Charley had

been a Navajo Tribal Council member for seven years.  Tr. at 224.  Mr. Charley testified

that CIT has kept the Education Committee informed about CIT's attempts to obtain

ISDA funding.  Tr. at 229.  Mr. Charley said that the Education Committee would have

helped CIT by providing more resolutions if CIT had asked.  Tr. at 231.

48.     The Navajo Tribal Council Intergovernmental Relations Committee adopted Resolution

IGRN-203-04, which approved CIT's efforts to contract under the ISDA for FYs 2003

and 2004.  The Committee also adopted Resolution IGRN 204-04 approving CIT's

contract proposal for FY 2005.  The Committee passed these resolutions on November

13

15, 2004, during this litigation, and months after the BIA declined contracts for FYs 2003
and 2004.

49.   BIA has previously acknowledged the Navajo Nation's relationship with CIT.  BIA
Regional Contracting Officer Jeff Sena wrote on August 25, 2003, "CIT is eligible to
receive this financial assistance award because it is a corporation wholly owned by the
Navajo Tribe and organized exclusively for educational, charitable, and governmental
functions, and as such, CIT provides institutional vocational training to adult Indians
residing on or near Indian reservations.  Article II of CIT's Articles of Incorporation, duly
adopted by the Advisory Committee of the Navajo Tribal Council, declare the corporation
to be a constituent agency of the Navajo Tribal government . . ." Pl. Ex. 11.

50.   At the relevant times, Mr. James McDivitt was the Deputy Assistant Secretary for
Management for BIA and the Department of Interior.  Tr. at 171.  Ms. Tiger gave a copy
of the tribal resolution (IGRJN-95-02) to Deputy Assistant Secretary McDivitt, who
referred it to Department of Interior lawyers.  Tr. at 66; Tiger Decl. ¶11.  Ms. Tiger faxed
the resolution to Mr. McDivitt on June 21 and June 28, 2002.  Pl. Ex. 71.  The resolution,
which was adopted June 17, 2002 by the Intergovernmental Relations Committee of the
Navajo Nation Council, states, "the Navajo Tribal Council amended the Crownpoint
Institute of Technology Articles of Incorporation . . . which empowers the Corporation to
secure funds from public and private sources . . ."   Pl. Ex. 71.  Mr. McDivitt told Ms.
Tiger that the tribal resolution documents were satisfactory.  Tr. at 105; Tiger Decl ¶11.

51.   On December 4, 2003, CIT requested in writing that the BIA provide technical assistance

14

and CIT renewed this request on December 9, 2003.  Pl. Ex. 16.  BIA did not provide

technical assistance.  Such assistance could have aided CIT in providing tribal resolutions

that would have been satisfactory to BIA Navajo Regional Office.  If President Tutt had

received the requested technical assistance and learned that there were deficiencies in the

tribal resolutions, he would have submitted what was required for an ISDA contract.  Tr.

at 259.   Ms. Tiger explained, "[i]t was my sincere expectation that . . . the meetings and

the verbal requests from Crownpoint personnel would result in technical assistance to

Crownpoint, at which time the Bureau would assist Crownpoint in putting together

whatever was necessary to do this."  Tr. at 107.

### F.    Summary Findings

52.     CIT's contract proposals for FYs 2003, 2004 and 2005 were for contractible programs,

had tribal authorization from the Navajo Nation, and otherwise satisfied ISDA

requirements.

53.     BIA's declinations were untimely as to CIT's contract proposals for FYs 2003, 2004 and

2005.

54.     BIA has not alleged that CIT ever misappropriated funds or ever failed to live up to the

requirements of prior financial assistance agreements.

## II.    CONCLUSIONS OF LAW

### A.    Jurisdiction

1.      This Court has jurisdiction under 25 U.S.C. § 450m(1)(a) (ISDA), 28 U.S.C. § 1331

(federal question), and 28 U.S.C. § 1361 (mandamus).

**B.      Congressional Intent That CIT Be Awarded Contracts**

2.      The United States Congress intended BIA to award CIT funds in the form of a contracts

with contract support costs.  H.R. Rep. No. 108-10 at 999 (2003); S.  Rep.  No. 108-89 at

41 (2004).

3.      The Snyder Act, codified at 25 U.S.C. § 13, grants broad authority for BIA and the

Secretary of the Interior to expend Congressional appropriations for Indian education, so

BIA had statutory authority to carry out Congressional intent to award ISDA contracts to

CIT.

**C.      Contractible Programs**

4.      The Secretary must contract for programs "which the Secretary is authorized to

administer for the benefit of Indians under the Act of November 2, 1921 (42 Stat. 208),

and any Act subsequent thereto."  25 U.S.C. § 450f(a)(1)(B).

5.      In this case, the relevant subsequent Act is the Adult Indian Vocational Training Act, 25

U.S.C. § 309.  In pertinent part, § 309 states, "the Secretary of the Interior is authorized to

undertake a program of vocational training."  Further, "[f]or the purposes of this program

the Secretary is authorized to enter into contracts or agreements . . . with any private

school . . ."  25 U.S.C. § 309.

6.      Each of CIT's contract proposals presented BIA with a contractible program under the

ISDA because 25 U.S.C. § 309 authorizes the Secretary to contract the program described

in CIT's proposals.  In awarding grant funding to CIT in 2003, BIA cited 25 U.S.C. § 309

as the statutory authority.  The Catalog of Federal Domestic Assistance lists 25 U.S.C.

§ 309 as a program administered by BIA.  Pl. Ex. 31.  Even though BIA did not operate an

adult vocational educational program at Crownpoint, BIA administered an adult

vocational training program at CIT by providing grant money to CIT.  CIT's adult

vocational training program is a BIA program even if BIA personnel are not running the

training program at Crownpoint because BIA includes CIT as a special program in BIA's

annual budget justifications.  Therefore, the Secretary was authorized under 25 U.S.C. §

309 to contract.

7.      **As United States District Judge William Alsup concluded last year when presented with a**
**similar legal question, "[o]nce the Secretary is authorized to do so, the [ISDA] requires**
**the Secretary to contract with a tribe so requesting unless one of the statutory exceptions**
**is shown."** Hopland Band of Pomo Indians v. Norton, **324 F. Supp. 2d 1067, 1074 (N.D.**
**Cal. 2004).**

8.      The ISDA was enacted to "permit an orderly transition from Federal domination of

programs for, and services to, Indians to effective and meaningful participation by the

Indian people in the planning, conduct, and administration of those programs and

services."  25 U.S.C. § 450a(b).  Congress stated the purposes of the ISDA in this

language:  "To provide maximum Indian participation in the Government and education

of the Indian people; to provide for the full participation of Indian tribes in programs and

services conducted by the Federal Government for Indians and to encourage the

development of human resources of the Indian people; to establish a program of

assistance to upgrade Indian education; to support the right of Indian citizens to control

their own educational activities; and for other purposes."  P.L. 93-638.

9.    BIA declined CIT's contract proposals for FYs 2003, 2004 and 2005 in part because CIT

was not applying to take over a federally-operated (BIA) program.  BIA also based its

declination on this statutory language:  "the program, function, service, or activity (or

portion thereof) that is the subject of the proposal is beyond the scope of programs,

functions, services, or activities covered under [the statute] because the proposal includes

activities that cannot lawfully be carried out by the contractor."  25 U.S.C. § 450f(a)(2)(E).


10.   As defined in 25 U.S.C. § 450b(j), a "'self-determination contract' means a contract . . .

between a tribal organization and the appropriate Secretary for the planning, conduct and

administration of programs or services which are otherwise provided to Indian tribes and

their members pursuant to Federal law. . . ."  This statutory section does not specify

whether "otherwise provided" means that the federal government must have previously

operated the program, rather than merely previously administered the program, in order

for the program to be contractible.  Under 25 U.S.C. § 450j-1(a)(1), which addresses

funding amounts rather than contractibility, "the amount of funds provided under the

terms of self-determination contracts entered into pursuant to this Act shall not be less

than the appropriate Secretary would have otherwise provided for the operation of the

programs or portions thereof for the period covered by the contract. . . ."  The statute

employs the conditional verb "would" but no condition is given;  it does not require that

in order to be contractible a program must have been previously operated by BIA.

11.     Education is generally a federally funded service that a federal agency would otherwise
        provide to Indians.

12.     Another statutory section lends support to the idea that Congress did not intend to require
        that a program be operated by BIA as a precondition to it being contractible under the
        ISDA.  "The programs, functions, services, or activities that are contracted under this
        paragraph shall include administrative functions of the Department of the Interior . . . that
        support the delivery of services to Indians. . . ."  25 U.S.C. § 450f(a)(1).  Congress again
        did not insert the term "previously operated" when broadly listing what can be
        contracted.

13.      In a Special Message to Congress on Indian Affairs in 1970, President Nixon also spoke
        of "administration" rather than "operation" of programs.  "For years we have talked
        about encouraging Indians to exercise greater self-determination, but our progress has not
        been commensurate with our promises.  Part of the reason for this situation has been the
        threat of termination.  But another reason is the fact that when a decision is made as to
        whether a Federal program will be turned over to Indian administration, it is the Federal
        authorities and not the Indian people who finally make that decision.  This situation
        should be reversed.  In my judgment, it should be up to the Indian tribe to determine
        whether it is willing to assume administrative responsibility for a service program which is
        presently administered by a federal agency."  S. Rep. No. 100-274 at 2-3 (1987).

14.     There is no controlling precedent indicating that a program must have been previously
        operated by the federal government in order to be contractible under the ISDA.  Language

in a recent Supreme Court case to the effect that the ISDA authorizes contracts "to supply federally funded *services . . . that a Government agency would otherwise provide*," <u>Cherokee Nation of Oklahoma v. Leavitt</u>, ___ U.S. ___, 125 S.Ct. 1172, 1175 (2005) (emphasis added), does not compel such a conclusion. <u>Cherokee Nation</u> presented the issue whether the government had a legal obligation to pay contract support costs for ISDA contracts, not what type of programs are contractible. Therefore, the quoted language is *dicta* and does not control the result in this case. The same is true of the underlying opinion of the Tenth Circuit Court of Appeals, which stated that the "basic idea behind the ISDA is to promote tribal autonomy and self-determination *by permitting tribes to operate programs previously operated by the federal government*, but to ensure that they do not suffer a reduction in funding for those programs simply because they assume direct operation of them." <u>Cherokee Nation of Oklahoma v. Thompson</u>, 311 F.3d 1054, 1055 (10th Cir. 2002) (emphasis added), *rev'd on other grounds by* <u>Cherokee v. Leavitt</u>, ___ U.S. ___, 125 S.Ct. 1172 (2005). Again, the "programs previously operated" language is *dicta* and does not compel a conclusion that CIT was not eligible for an ISDA contract because the BIA did not previously operate such a program.

15. A narrow reading of the statute, as proposed by Defendants, that would require specific programs be previously operated by the federal government would undermine the purpose of self-determination, because tribes would not be able to set their own agendas and instead would be bound to a plan determined by federal bureaucracy. The legislative history favors an interpretation of the ISDA that facilitates tribes progressing into

modernity, without regard to what programs BIA previously operated.  Congress

specifically found that "the prolonged Federal domination of Indian service programs has

served to retard rather than enhance the progress of Indian people and their communities

by depriving Indians of the full opportunity to develop leadership skills crucial to the

realization of self-government, and has denied to the Indian people an effective voice in

the planning and implementation of programs for the benefit of Indians which are

responsive to the true needs of Indian communities."  25 U.S.C. § 450(a)(1).

16.     The applicable regulations also support a broad interpretation of contractibility.  "It is the

policy of the Secretary that the contractibility of programs under this Act should be

encouraged.  In this regard, Federal laws and regulations should be interpreted in a

manner that will facilitate the inclusion of those programs or portions of those programs

that are for the benefit of Indians . . .."  25 C.F.R. § 900.3(b)(8).  The regulations also

provide:  "The Secretary's commitment to Indian self-determination requires that these

regulations be liberally construed for the benefit of Indian tribes and tribal organizations

to effectuate the strong Federal policy of self-determination and, further, that any

ambiguities herein be construed in favor of the Indian tribe or tribal organization so as to

facilitate and enable the transfer of services, programs, functions, and activities, or

portions thereof, authorized by the Act."  25 C.F.R. § 900.3(b)(11).

17.     Congress' broad view of contractibility applies not just to BIA programs, but also to the

programs of other federal agencies such as the Bureau of Reclamation and the United

States Fish and Wildlife Service.  Congress did not exempt any program from the ISDA.

The Senate Indian Affairs Committee expressed this through an example. "The Committee believes that in requiring the Secretary of the Interior to enter into a self-determination contract, at the request of the Indian tribe, to plan, conduct and administer programs or portions thereof administered by any agency within the Department of Interior, the Act is intended to include, for example, programs of the Bureau of Reclamation or the United States Fish and Wildlife Service, for which funds are appropriated by the Congress for the benefit of such tribe." S. Rep 100-274 at 23 (1987).

18.   The Senate Report continued, "tribes are eligible to contract for any program or function operated by [the] Secretary for the benefit of tribes, regardless of whether such specific programs or functions are operated locally. For example, a tribe may need to conduct a natural resources planning and management program under a self-determination contract. The fact that natural resources planning and management is not operated locally by the Bureau of Indian Affairs agency office should not prevent the Secretary from entering into a contract with that tribe. Furthermore, the fact that the Secretary has decided to allocate funds to a local agency in a particular manner should not bar the tribe from contracting for functions, such as criminal investigation, for which funds have been not allocated to that particular agency." S. Rep. 100-274 at 25 (1987). The ISDA "uniquely requires the Secretary . . . to continue providing direct services until such time as a tribe freely chooses to contract to operate those services. At that point, the Secretaries are required to transfer resources and control over those programs to the tribe." S. Rep. 100-274 at 6 (1987). Nothing in this legislative history suggests that Congress intended for the

ISDA to require that a program be previously operated by BIA in order to be contractible.

19.   The ISDA does not require that a program have been previously operated by BIA in order

for the program to be contractible.

**D.   Navajo Nation Tribal Resolutions**

20.   CIT submitted a tribal resolution with its contract proposals to the Secretary, which

satisfied CIT's duty under 25 U.S.C. § 450f(a)(1).  The tribal resolution substantially

complied with the requirements under 25 C.F.R. § 900.8.

21.   The Secretary, if dissatisfied with CIT's submissions, had a statutory duty to assist CIT in

submitting what the Secretary considered to be satisfactory tribal resolutions.  "Whenever

the Secretary declines to enter into a self-determination contract or contracts pursuant to

subsection (a) of this section, the Secretary shall . . . (2) provide assistance to the tribal

organization to overcome the stated objections."  25 U.S.C. § 450f(b)(2).

22.   In 1987, the Senate Indian Affairs Committee commented on the tribal resolution

requirement and stated, "it is not intended to allow Federal agencies to use the resolution

process as an obstacle to requests to enter into contracts. . . ."  S. Rep. 100-274 at 22

(1987).  Moreover, in explaining the amendment adopted by the committee that clarified

the resolution requirement, the report declared, "this change in the law is not meant to

change the existing practice of tribes that provide a one-time, open-ended resolution

authorizing a tribal organization to request contracts from year to year.  The guiding

principle is that the tribal governing bodies should determine how frequently tribal

organizations are reauthorized to enter into contracts.  Similarly, tribal governments

should make their own determinations about the frequency and nature of oversight of contracts with tribal organizations." S. Rep. 100-274 at 23 (1987). "The current practice of Federal agencies that impose 'threshold criteria' on a self-determination contract application is clearly inconsistent with the intent of the Indian Self-Determination Act," according to the Senate Report 100-274 at 24 (1987).

### E.      BIA Declination Authority and Procedures

23.     The United States Code 25 U.S.C. § 450f(e)(1) places the burden of proof on the Secretary to "clearly demonstrat[e] the validity of the grounds for declining the contract proposal." The regulations also place this burden on the Secretary. 25 C.F.R. § 900.163. The Secretary has not met her burden of proof by clearly demonstrating the validity of the grounds for declining CIT's contract proposals.

24.     Legislative history explains why Congress placed the burden of proof for declination on the Secretary. According to the Senate, "[t]he Committee amendment directs [the Secretary] to approve contract proposals within ninety days unless the Secretary provides a basis, as provided in the Act, for declining a contract. The burden of proof for declination is on the Secretary to clearly demonstrate that a tribe is unable to operate the proposed program or function. The intent of the Committee in retaining the declination criteria and the declination process is to insure that denials of requests for self-determination contracts are handled only through the declination process." S. Rep. 100-274 at 24 (1987).

25.     The regulations establish a strict timeline by which the Secretary must act; the Secretary

has two days in which to notify the applicant that the contract proposal has been received, and 15 days to notify the applicant of any items missing from the application.  25 C.F.R. § 900.15.  Within 90 days of the receipt of the contract proposal, the Secretary must either award the contract or decline the proposal.  25 C.F.R. § 900.16.  The Secretary violated this duty by failing to act in a timely manner with respect to all three contract proposals for FY 2003, FY 2004 and FY 2005.

**F.     CIT's Contract Proposals Submitted to BIA**

26.    The contract proposals submitted by CIT for FYs 2003, 2004 and 2005 conformed to the legal requirements for a P.L. 93-638 contract.

27.    The contract proposals for FYs 2003 and 2004 are deemed approved on March 9, 2004, 90 days after the December 9, 2003 submissions.  The FY 2005 contract proposal is deemed approved on May 27, 2005, 120 days after the January 27, 2005 submission.

28.    CIT is entitled to additional funding for contract support costs for FYs 2003, 2004 and 2005 in amounts to be determined.

**G.     Mandamus Relief is Appropriate**

29.    Relief in the form of mandamus is available in IDSA cases.  "[T]he district courts may order appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this Act or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this Act or regulations promulgated hereunder (including immediate injunctive relief to reverse a declination

finding under section 102(a)(2) or to compel the Secretary to award and fund an approved self-determination contract)." 25 U.S.C. § 450m-1(a).

30.     The specific mandamus relief authorized by the ISDA relieves CIT of proving the usual equitable elements including irreparable injury and absence of an adequate remedy at law. *See* Atchison, Topeka & Santa Fe Ry. v. Lennen, 644 F.2d 255, 260 (1981) (*per curiam*) (where injunction authorized by statute, unnecessary to prove usual equitable grounds; enough to show requirements of statute satisfied); *accord* Star Fuel Marts, LLC v. Sam's East, Inc., 362 F.3d 639, 651-52 (10th Cir. 2004); Shadid v. Fleming, 160 F.2d 752, 753 (10th Cir. 1947).

31.     CIT satisfied all the requirements of the ISDA for its contract proposals for FYs 2003, 2004 and 2005.

32.     The ISDA requires the Secretary to enter into self-determination contracts with tribal organizations that properly request contracts for contractible programs.  The Secretary had a clear, nondiscretionary duty to approve the ISDA contract proposal s submitted by CIT for FYs 2003, 2004 and 2005 when she failed to decline them within the statutorily-allowed time.  Therefore, issuance of a writ of mandamus is appropriate in this case.

An Order and a Declaratory Judgment and Writ of Mandamus will be entered contemporaneously with these Findings of Fact and Conclusions of Law.

_____
SENIOR UNITED STATES DISTRICT JUDGE